**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 20-CR-399-1 |
| v. | |
| KYLE NATHANIAL | Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

On March 18, 2020, Chicago Police Officers executed a traffic stop on a silver Mitsubishi occupied by three individuals, including the Defendant, Kyle Nathanial. At that time, the Defendant, then on federal probation, had a pistol in his pocket, and officers arrested him. Four months later, the Grand Jury indicted him for unlawful possession of a firearm—namely, a loaded Taurus Model PT111, 9mm semiautomatic handgun, in violation of 18 U.S.C. §§ 922(g)(1). *See* [2].

On June 4, 2021, based upon the absence of *Miranda* warnings, Defendant moved to suppress statements he made to police concerning his possession of the gun, his ownership of a backpack and cannabis at the scene, and his failure to possess a FOID card or a Concealed Carry License. *See* [25]. That same day, he also moved to quash his arrest and suppress all evidence derived from it, because he believes that the initial stop of the vehicle, and the resulting searches, were unlawful. *See* [26].

## I. Court Proceedings

On March 4, 2022, this Court held an evidentiary hearing to resolve any factual disputes arising from the Defendant's motions. The Government called two witnesses from the scene of the arrest: Chicago Police Officers Anfrenee Ixcot and Patrick Mamaat.[1] The Government also admitted the officers' body worn camera footage into evidence, and the parties stipulated to certain facts, including that the body camera footage fairly and accurately depicted the events captured by the cameras over the course of the traffic stop. [38] at 1; [40] at 9. After calling Officers Ixcot and Mamaat, the Government indicated that it had no further witnesses, and the Defendant did not call any witnesses.

Before allowing the parties to argue the motions to suppress, this Court asked the parties to clarify the potential trial evidence at issue.[2] The parties then argued the motions, and the Court held the record open to allow the parties to submit additional

---

[1] Based upon the in-court proceedings, this Court makes the factual finding that both officers testified credibly. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (Generally, the trial court's credibility determinations are entitled to deference "because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'") (quoting *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) and *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)).

[2] The Government proffered that, if the case were to proceed to trial, it would seek to admit the pistol Defendant handed to Mamaat when he exited the car, as well as Defendant's two initial statements (as described in more detail below): "here you go" (made when he handed Officer Mamaat the gun from his pocket) and "I handed it to him" (made in response to an assisting officer's statement "you had a pistol"). *Id.* at 87. The Government also represented that it would not seek to admit Defendant's later statements at the scene about the absence of a FOID card or CCL, or any statements or evidence concerning Defendant's possession of the cannabis and backpack, making Defendant's motions to suppress moot as to these other pieces of evidence. *Id.* at 87.

2

evidence if they wanted to do so and continued the evidentiary hearing to August 2, 2022.

At the continued hearing, the Government submitted additional photos (admitted without objection for purposes of the motion to suppress) showing that the trunk of the Mitsubishi was open when police curbed the vehicle.[3] The Defendant again offered no testimony or evidence. Accordingly, the Court closed the factual record and took Defendant's motions under advisement.

On December 1, 2022, this Court orally denied the motions from the bench, promising a separate written order in due course. *See* [49]. This ruling constitutes the Court's findings of fact and conclusions of law on the Defendant's motions.

## II. Findings of Fact

On March 18, 2020, while patrolling an area they knew suffered from high crime rates for guns and narcotics, Officer Ixcot and his partner Mamaat were driving westbound on 71st Street near Eggleston, when they observed and stopped a silver

---

[3] Defendant disputes that the trunk was open, but this Court finds otherwise. The Government's exhibits—images taken from the officers' body cam footage, which were admitted without objection at the August 2, 2022 hearing—clearly show that the trunk was not fully closed or secured, and the officers themselves observed this fact as depicted in the recording (indeed, the parties stipulated that the officers' body worn camera video accurately depicted the events relating to the traffic stop, *see* [40] at 3–4, and both officers testified that this footage fairly and accurately captured the events during the traffic stop, *id.* at 9 (Ixcot), 70 (Mamaat)). Thus, even if Officer Ixcot did not offer the condition of the trunk as a legal predicate for initiating the traffic stop, his personal observations of the trunk's condition provide an alternative basis to lawfully stop the vehicle, even if the taillight (rather than the trunk) motivated the officer's subjective decision to act. Under well-settled law, if officers collectively possess information supporting probable cause (or reasonable suspicion under *Terry*), then their subjective motivations do not invalidate the search or seizure, because the relevant determination remains based upon "the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard." *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010).

Mitsubishi because one of the car's taillights had a broken cover.[4] [25] at 1; [26] at 1; [40] at 8–9. The officers' body worn cameras captured video of various viewpoints of the interaction, which lasted approximately twenty minutes in total.[5]

After the officers exited the squad car and activated their body worn cameras, Officer Ixcot approached the driver's side door and Officer Mamaat approached the passenger side. At this point, the officers observed three individuals: the driver (later identified as Tanisha White), a front seat passenger, and a backseat passenger (later identified as the Defendant, Kyle Nathanial). [25] at 1. The officers did not know any of the individuals when they executed the stop. Officer Ixcot asked Ms. White for her driver's license and insurance, asked the occupants to roll down the windows, and asked if anyone had a FOID card or a Concealed Carry License. [26] at 1; [40] 9, 13, 16. Ms. White said they did not. *Id.* at 16. Within a minute of approaching the car, Officer Ixcot also observed that neither passenger was wearing a seatbelt, so he asked them why they were not wearing their seatbelts, and Ms. White claimed that they had just gotten into

---

[4]With regard to taillights, the City of Chicago Municipal Code requires cars to "exhibit at least one lighted lamp which shall be so situated as to throw a red light visible for at least 500 feet in the reverse direction," § 9-76-050(c), and the Illinois Vehicle Code requires cars to "exhibit at least 2 lighted lamps, commonly known as tail lamps, which shall be mounted on the left rear and right rear of the vehicle so as to throw a red light visible for at least 500 feet in the reverse direction," 625 ILCS 5/12-201(b).

[5] On March 18, 2020, Officers Ixcot and Mamaat were assigned as beat patrol officers in the 7th District on the City's south side. By that time, Ixcot had been a police officer for four years and had participated in over 50 arrests, [40] at 6–7, and Mamaat had been a police officer for two years, *id.* at 58. On the night of the arrest, the officers were working third watch, from 3:00 p.m. to midnight, and they were in full uniform, patrolling in their marked police car. [40] at 7–8, 58–60.

the car.⁶ *Id.* at 17. Ms. White provided her license and insurance, and both passengers provided identification as requested. [40] at 12, 64–65.

Upon first approaching the car, both officers also smelled the strong odor of burnt cannabis, and, with the help of his flashlight, Officer Ixcot specifically observed burnt cannabis in the center console in plain view. [40] at 13–14.⁷ Upon smelling the burnt cannabis, Officer Ixcot asked the driver and passengers when they last smoked inside the car, and Ms. White responded "about two hours"; at the time, Officer Ixcot knew smoking cannabis in a car was unlawful.⁸ *Id.* at 18.

---

⁶ Illinois law requires that "each driver and passenger of a motor vehicle operated on a street or highway in this State shall wear a properly adjusted and fastened seat safety belt." 625 ILCS. 5/12-603.1(a).

⁷ Officer Mamaat testified that, as soon as he approached the car, he could smell the strong odor of cannabis coming from inside the vehicle, though he did not personally see cannabis in the car at that point; he also testified that, at that time, he knew it was legal to possess marijuana if it was stored in an odorless container, but that it was still illegal to smoke it in a car. [40] at 64, 72–75. As part of the stop, Officer Ixcot later recovered Defendant's backpack and a large baggie containing 102.8 grams of cannabis from the rear seat.

⁸ Under the Cannabis Regulation and Tax Act, an Illinois resident 21 years of age or older may possess up to and including 30 grams of cannabis. 410 ILCS 705/10-10. But cannabis may not be possessed in a vehicle unless it is in a "reasonably secured, sealed container and reasonably inaccessible while the vehicle is moving." 410 ILCS 705/10-35(a)(2)(D). And the law precludes cannabis use while in a vehicle, *id.* § 10-35(a)(3)(D), and precludes the operation of a motor vehicle "while using or under the influence of cannabis in violation of Section 11-501 or 11-502.1 of the Illinois Vehicle Code (that is, if the person has, within two hours of driving or being in actual physical control of a vehicle, a THC concentration in their blood or urine of either 5 nanograms or more of delta-9-THC per milliliter of whole blood or 10 nanograms or more of delta-9-THC per milliliter of other bodily substance), *id.* § 10-35(a)(5); 625 ILCS 5/11-501(a)(7); 625 ILCS 5/11-501.2(a). In other words, regardless of "recent changes in the law legalizing possession of small amounts of cannabis, there are still, among other things, (1) illegal ways to transport it, (2) illegal places to consume it, and (3) illegal amounts of it to possess." *People v. Molina*, NO. 4-22-0152, 2023 WL 2751668, at \*6 (Ill. Mar. 29, 2023). Thus, "an officer who smells cannabis in a vehicle he has just stopped is almost certain to discover a violation of the Vehicle Code because the law clearly states that when cannabis is transported in a private vehicle, the cannabis must be stored in a sealed, odor-proof container—in other words, the cannabis should be undetectable by smell by a police officer." *Id.* On cross-examination at the hearing, Officer Ixcot admitted that he did not include his observations of cannabis in his reports for the firearms offense. [40] at 38. This omission is not material to the motion, however, given the nature of the police report, the resulting firearm offense, and the officer's credible testimony.

Officer Ixcot then returned to his squad car to run the identification documents through the car's computer, and Officer Mamaat stayed at the car and chatted with the occupants. [40] at 65. During that conversation, Ms. White told Officer Mamaat that she had already gotten a ticket for her broken taillight. *Id.* Per the parties' stipulation, Officer Ixcot ran Defendant's identification on March 18, 2020 at 7:08 p.m., while on the scene, before returning to the car, and before Officer Mamaat ever asked Defendant to step out of the car. *See* [44]. When Officer Ixcot ran Defendant's identification, he learned that Defendant was on federal probation, so he then radioed for an assist unit. [40] at 18–19. Chicago Police Officer Adam Bennett and his partner, Officer Michael Jetel, were dispatched to respond to the scene. *Id.* at 19.

Upon the arrival of the back-up officers (about 8 minutes and 20 seconds after the initial stop of the car), the officers asked all three occupants to exit the vehicle. Officer Ixcot took Ms. White out of the car and detained her, while Officer Bennett detained the front seat passenger, and Officer Mamaat went to detain the Defendant. *Id.* at 20.

When Officer Mamaat opened the backseat door, Defendant got out of the vehicle. Upon Defendant's exit, Officer Mamaat began to reach for and touch Defendant's right jacket pocket, but Defendant turned away from him, pulled a handgun out of his jacket, and handed it over to Officer Mamaat.[9] [40] at 20–21, 67–70, 80–82. In response, Officer Mamaat shouted "gun" to his fellow officers, put the weapon on the ground, and immediately placed Defendant into custody, handcuffing him. Officer Bennett placed

---

[9] The body camera footage confirms, and this Court finds, that Defendant voluntarily surrendered his gun *before* the officer began the pat down search.

6

his hands on Defendant's back to assist in the handcuffing and told him, "don't do anything stupid." *Id.* at 2. Then, Defendant told Bennett that he had not done anything, and Officer Bennett stated, "You had a pistol" and Defendant responded by saying that he had handed the gun to Mamaat.[10] Thereafter, Officer Ixcot retrieved the gun from the grass, "cleared it" of the magazine and shells, and placed it in the squad car to be inventoried at the station. *Id.* at 21–22. At the hearing, Officer Mamaat testified that Defendant was fully cooperative throughout the encounter. *Id.* at 81–82.

At this point, the officers arrested the Defendant and brought him to the police station for processing; Ms. White received two traffic tickets: one for having a missing tail lamp and a second for having expired plates.[11] *Id.* at 26–27.

On July 23, 2020, the Grand Jury indicted the Defendant for being a felon in possession of a firearm [1], [2].

## III. Conclusions of Law

Defendant first argues that the pistol, and his initial statements from the stop (i.e., the only statements the Government intends to offer at trial), must be suppressed

---

[10] While now a moot issue (given the Government's decision not to use Defendant's later statements), the officers also questioned Defendant after recovery of the gun, asking if he had a FOID card, if the gun was his, and if it was loaded. In response, Defendant admitted that he did not possess a FOID card or a Concealed Carry License; Officer Ixcot also asked Defendant if the backpack in the backseat with the cannabis belonged to him, and Defendant said that it did.

[11] On cross-examination at the evidentiary hearing, Officer Ixcot conceded that he now knows that the Chicago Municipal Code requires only one working taillight, which Ms. White's car had. *Id.* at 29–30. Nevertheless, he also testified that even though both lights appeared to be working, one of the taillight covers was cracked and broken off, such that only part of the light shone red, while the other part shone white. *Id.* at 31, 53. He testified that he did not observe Ms. White make any moving violations, but that he did observe the "equipment violations" on her car. *Id.* at 33. Finally, even though the license plates on Ms. White's car were expired, Officer Ixcot stated that he did not discover this fact until about 19 minutes into the traffic stop. *Id.* at 33–34.

because the stop was unlawful in the first instance. But the facts undermine his claim.

Officers may "stop and detain briefly a person for investigative purposes" when they have "a reasonable suspicion, supported by articulable facts, that criminal activity is afoot." *United States v. Pace*, 48 F.4th 741, 749 (7th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). Reasonable suspicion exists "when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (quoting *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020)). Although reasonable suspicion "requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" *Id.* (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). *See also United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018) ("To pull a car over for a brief investigatory stop, a police officer must have 'at least [an] articulable and reasonable suspicion' that the particular person stopped is breaking the law.") (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).

Defendant's objections notwithstanding, the officers' knowledge that the patrol beat constituted an area known for high rates of gun and narcotics crimes, coupled with their specific observations of the Mitsubishi's cracked taillight cover (and unsecured trunk) constitutes sufficient articulable facts to justify the officers' decision to stop the car. Defendant argues that Officer Ixcot's stated basis for the stop was pretextual because Ms. White's car had two working taillights. Officer Ixcot, however, initiated the traffic stop after observing that the taillight was broken. [40] at 8–9. And, in fact, his body camera footage confirms that, even though both lightbulbs appear to be

illuminated, the red cover on the driver's side was broken, such that the overall light emanating backward appeared white, not red, in violation of the law.

More importantly, even if Officer Ixcot was mistaken in his belief that Ms. White's car violated the technical equipment requirements in the Chicago Municipal Code, such a mistake does not vitiate his reasonable suspicion and render the stop unlawful. As the Supreme Court said in *Heien v. North Carolina*,

> Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: The facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

574 U.S. 54, 61 (2014). Officer Ixcot's subjective understanding that a broken taillight cover that allowed the light to show white, not red, constituted a violation of the Chicago Municipal Code (even if inaccurate) was not unreasonable, especially where, as here, such broken equipment violates the Illinois Vehicle Code. *See* 625 ILCS 5/12-201(b) (requiring cars to "exhibit at least 2 lighted lamps, commonly known as tail lamps, which shall be mounted on the left rear and right rear of the vehicle so as to throw a red light visible for at least 500 feet in the reverse direction").

*Heien* is particularly instructive. In that case, police pulled the defendant over for a faulty brake light and then arrested him when a search of his car revealed a sandwich bag of cocaine; he moved to suppress the cocaine, arguing that the traffic stop was unlawful because North Carolina law required only one working brake light, which

9

he had. The state Supreme Court accepted Heien's characterization of North Carolina law and accepted that the single faulty brake light did not violate the law, but it nonetheless held that the stop was valid. 574 U.S. at 57–59. The case then went before the United States Supreme Court, where Heien argued that it was unfair to excuse police officers' mistakes when "ignorance of the law is no excuse" for "the citizenry"; but the Court disagreed, stating:

> Just as an individual generally cannot escape criminal liability based on a mistaken understanding of the law, so too the government cannot impose criminal liability based on a mistaken understanding of the law. If the law required two working brake lights, Heien could not escape a ticket by claiming he reasonably thought he needed only one; if the law required only one, Sergeant Darisse could not issue a valid ticket by claiming he reasonably thought drivers needed two. But just because mistakes of law cannot justify either the imposition or the avoidance of criminal liability, it does not follow that they cannot justify an investigatory stop. And Heien is not appealing a brake-light ticket; he is appealing a cocaine-trafficking conviction as to which there is no asserted mistake of fact or law.

574 U.S. at 67. The illustration is dispositive. If Officer Ixcot were, in fact, mistaken about the law, that mistake would only invalidate the ticket issued to Ms. White. But his reasonable belief that her car failed to comply with legal taillight requirements (which the car failed to do under state law) nonetheless justifies the initial traffic stop, and the lawful actions flowing from it.

To the extent Defendant challenges the officers' decision to get him out of the car and conduct a pat down, this Court similarly finds that their actions complied with the Constitution. Without question, an officer conducting a valid traffic stop "can detain the occupants of the vehicle long enough to accomplish the purpose of the stop," and, "as part of the stop, police may ask the vehicle's occupants 'a moderate number of questions'

and request their identification." *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)); *United States v. Moore*, 375 F.3d 580, 582 (7th Cir. 2002) (Background check and questioning of passengers remains a lawful part of a traffic stop). Even though a stop might become unlawful if it is "prolonged beyond the time reasonably required to complete the mission," the "mission" itself may lawfully include not only addressing the violation that warranted the stop, but also attending to related safety concerns. *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). Indeed, checking the criminal histories of the occupants of a car during a traffic stop—"a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants"—is "permissible even without reasonable suspicion." *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015). *See also Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (once police have lawfully stopped a car for a traffic violation officers may, consistent with the Constitution, order the driver and passengers out of the vehicle pending completion of the stop) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997)). Moreover, both officers credibly testified that when they approached the car, they smelled "a strong residue" of burnt cannabis; based upon such observations, Officer Ixcot asked the occupants when they last "smoked inside the vehicle"; and the driver replied, "about two hours ago." [40] at 13, 18. Once the officers approached the car and smelled the strong odor of burnt cannabis, they had probable cause to believe that criminal activity was afoot (or, at the very least, they possessed reasonable suspicion for numerous violations, including 410

11

ILCS 705/10-35(a) or 625 ILCS 5/11-501, among others). *See United States v. Colbert*, 54 F.4th 521, 528 (7th Cir. 2022) ("Like alcohol, marijuana is an intoxicating substance, and the odor of marijuana in a vehicle or on a suspect raises concern for officers that a defendant may act in an unpredictable and dangerous manner" and the odor of marijuana is therefore properly considered as a factor supporting reasonable suspicion). In short, based upon the totality of the officers' collective observations, the *Terry* stop and the attempted pat down of the Defendant remained lawful.[12]

Defendant makes several other arguments in support of his suppression motions, but none hold sway.

First, Defendant argues that officers arrested him immediately upon discovering that he had a gun, and before they asked the Defendant himself if he had a FOID card or a Concealed Carry License. As a result, Defendant argues, the officers had no reason to believe his possession of the gun was unlawful when they arrested him. Not so. Officer Ixcot testified that when the officers lawfully ordered Defendant and the others out of the vehicle, they already knew he was on federal probation; they thus had reason

---

[12] Likewise, the smell of burnt cannabis also gave rise to probable cause or a reasonable suspicion that Defendant, who the officers knew at the time to be on federal probation, may also be violating the terms of his probation. Although the police officers ultimately arrested Defendant for something other than a traffic offense, or a cannabis-related crime or probation violation, that does not undermine their legal authority to act as they did in this case. *See Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) ("because probable cause is an objective standard, Norris's arrest was lawful if Officer Serrato had probable cause to arrest him for *any* offense, regardless of the reason the police were called or the reason given for the arrest.") (emphasis in original) (citing *District of Columbia v. Wesby*, —— U.S. ——, 138 S.Ct. 577, 584 n.2 (2018); *Devenpeck v. Alford*, 543 U.S. 146, 153–55 & n.2 (2004)); *Ohio v. Robinette*, 519 U.S. 33, 38 (1996) ("As we made clear in *Whren,* '"the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."'); *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("probable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause.").

to believe he was a convicted felon, legally prohibited from possessing a gun. Likewise, at this time, Ms. White had already advised the officers that none of the occupants of the vehicle possessed a CCL or FOID card, and Defendant's possession of the firearm thus remained unlawful for those reasons as well.

Defendant also argues that, even though he volunteered the gun to Officer Mamaat, he did not actually consent to giving the officer his gun; rather, the officer had initiated a pat down, which vitiates any consent. Even if the evidence at the hearing supported Defendant's version of the facts (which it does not), the attempted pat down was entirely lawful under the circumstances, as explained above. *See, e.g., Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns.") (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *United States v. Patton*, F.3d 734, 739 (7th Cir. 2013) (Factors supporting pat down include the smell of marijuana or alcohol, because officers possess "greater reason to be concerned" that individuals "might do something unpredictable, unwise, and dangerous."). Deciding to conduct a pat down upon an individual known to be on federal probation who just emerged from a car operating in violation of the vehicle code, smelling strongly of burnt marijuana in a high-crime area, falls squarely within the realm of "attending to related safety concerns." *Rodriguez*, 575 U.S. at 354; *Colbert*, 54 F.4th at 528 (7th Cir. 2022) ("odor of marijuana was therefore properly considered by the district court as a factor supporting reasonable suspicion to frisk").

Finally, Defendant argues that the investigative stop ripened into an arrest at some point, and the officers, at that time, were required to read Defendant his *Miranda* warnings; because they failed to do so, he argues, the statements the Government intends to offer at trial must be suppressed. Again, the factual record undermines his claim.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), the admissibility of a custodial statement remains conditioned upon prior warnings regarding the suspect's rights against self-incrimination. Failure by law enforcement to give the prescribed warnings and obtain a waiver of those rights before custodial questioning generally requires exclusion of any resulting statements. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). Before "*Miranda* warnings are required, however, the suspect must be both 'in custody' and subjected to 'interrogation.'" *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007) (quoting *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006)) (cleaned up).

In this case, Defendant plainly was "in custody" once Officers Mamaat and Bennett placed him in handcuffs. Defendant argues that the circumstances of the pat down—including the fact he was surrounded by officers (two of whom put their hands on him when he surrendered the firearm)—demonstrate that he was in custody and not free to leave. And the Government conceded at the March 4, 2022 hearing that the *Terry* stop ripened into an arrest the moment Defendant handed the gun to Officer Mamaat, and thus, any questioning from that point onward would have to comply with *Miranda*, or the answers would be inadmissible. [40] at 150. Based upon this timeline, this Court finds that the volunteered statement "here you go" and the discovery of the gun both

preceded the arrest (and thus the first comment remains admissible); and Defendant's suppression theory applies only to Defendant's subsequent statement "I handed it [the gun] to him."

Significantly, however, the testimony and body camera footage demonstrate that this second statement did not stem from any interrogation. To be sure, "interrogation" means more than just "express questioning"; it refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (interrogation includes questioning or its "functional equivalent"); *United States v. Johnson*, 680 F.3d 973, 974 (7th Cir. 2012). But the Fifth Amendment does not bar volunteered statements of any kind. *Miranda*, 384 U.S. at 478. Thus, if a defendant makes a statement in response to words or actions by officers that do not constitute interrogation, or if he initiates communications, the law does not prohibit the officers from listening to his voluntary statement. *United States v. Jones*, 600 F.3d 847, 855 (7th Cir. 2010).

Defendant claims that, while Officer Bennett was helping to cuff him, Bennett said, "don't do anything stupid," and in response, Defendant said, "I didn't even do nothing." [25] at 2. Officer Bennett then stated, "you had a pistol," to which Defendant replied, "I handed it to him." *Id.* Although the officer's remarks consisted of an instruction and a statement (rather than questions), Defendant nonetheless asserts a *Miranda* violation, claiming he made his own statements to show that he was not being aggressive or combative. *Id.* Whatever the Defendant's reason for volunteering his

15

comments, it is clear from the sworn testimony and the officers' body camera footage that the colloquy between Officer Bennet and Defendant involved words "normally attendant to arrest" not expressions "likely to elicit an incriminating response from the suspect" under the law.

In *Rhode Island v. Innis*, officers arrested an individual believed to have killed a taxi driver using a sawed off shotgun; the police found the man, but did not find the gun, and, while driving with the defendant in the backseat, began discussing with each other the danger the missing gun posed to children in the area, which was near a school; the defendant interrupted the officers' conversation and told them to turn the car around so he could show them where to find the gun. 446 U.S. at 294–95. After the defendant was charged with murder, he moved to suppress the shotgun and the statements he made to police about it. The case made its way to the United States Supreme Court, which rejected his claim that the evidence was obtained in violation of *Miranda*:

> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off-hand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative."

446 U.S. at 303.

*Innis* applies here. Although Officer Bennett in this case directed his brief comments at Defendant and not his fellow officers, the entire exchange still consisted

of "no more than a few off-hand remarks"; Bennett asked Defendant no questions, and his remarks were not "evocative" or otherwise designed to illicit a response from Defendant. And even if the Court accepts Defendant's characterization of Bennett's comments as implying that he was being aggressive or combative (a characterization not supported in the evidence), nothing in the factual record indicates that the officers knew, or should have known, Defendant would be particularly susceptible to, or provoked by, any such implication. As a result, this Court finds that the Defendant was not "subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." *Innis*, 446 U.S. at 303. In short, there was no interrogation.

Given this factual record, Defendant's statement, "I handed it to him," need not be suppressed based upon the absence of *Miranda* warnings. *Id. See also United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (finding that "voluntary statements"—that is, statements that are not the result of "compelling influences, psychological ploys, or direct questioning"—are not subject to *Miranda* warnings) (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987); *United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999)); *United States v. Abdulla*, 294 F.3d 830, 836 (7th Cir. 2002) (finding no *Miranda* violation, in part, because "the agents had only been with Mr. Abdulla for a very short time" before his statement and because there was "no indication that any pressure was put on him."); *Arizona v. Mauro*, 481 U.S. at 527 (finding no *Miranda* violation where the officer asked the defendant "no questions . . . about the crime or his conduct" and where the officer's decision to allow the defendant to see his wife was not "the kind of

psychological ploy that properly could be treated as the functional equivalent of interrogation").

## III. Conclusion

Consistent with the above findings of fact and conclusions of law, this Court denied Defendant's motions to suppress [25], [26] on December 1, 2022 [49].

Date: April 24, 2023

ENTERED:

_____
John Robert Blakey
United States District Judge